Good morning, and welcome to the Ninth Circuit. Before we go to our argued cases, we have a number of cases submitted on the briefs, and I'll go ahead and do that now. Skaggs v. Scioli, Reed v. Nelson, Haddad v. SMG, Long-Term Disability Plan, and Chesson v. City of Raphael are all submitted on the briefs and will be submitted as of this day. The first case for argument is Ning Xiehua v. Oath Holdings. Counsel, can you hear me on Mr. Hoffman? Yes, yes, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, Paul Hoffman for Plaintiff Ning. I'd like to start, with the Court's permission, on the issue of aiding and abetting. The District Court did not consider plaintiffs' aiding and abetting claims, and it is our belief that the First Amendment complaint adequately alleges all of the elements of aiding and abetting claims. The actus reus being the disclosure of Mr. Ning's confidential information directly to the PRC authorities, which led directly to his arrest and torture and imprisonment, that's shown in part by the 2004 prosecutor's memo that included Mr. Ning's emails as a reason for prosecuting him. Counsel, do your aiding and abetting allegations apply both to your ATS claim and to the TVPA claim? Yes, yes, and I think that the same standards really apply to both. The main difference, I think, between the claims for these purposes is the issue of extraterritoriality, in the sense that the TVPA is extraterritorial by statute, and the ATS, of course, is subject to the Supreme Court's jurisprudence on the presumption against extraterritoriality. There's one thing that I need to get settled in my mind, which is kind of foundation for all your claims, and that's the secret agreement question, because I counted up about 15, 20 times in the pleadings the allegation of the secret agreement without any underlying details, but then in the brief there's sort of a stepping back and saying, well, we're not necessarily, it doesn't depend on a secret agreement. So are you alleging a secret agreement? And if not, what are all those allegations relevant to? Well, the secret agreement was a way, and probably an unartful one, given the way the district court went, of describing what exactly the defendants did. In other words, what our position is, is that defendants Yang and Semmel, in particular since they were in charge of Yahoo when they were negotiating entry into the Chinese market, had to agree to disclose confidential information of their users in order to get into the Chinese market. That was done secretly. It was concealed. It's never been revealed in that manner. And what they knew going into that, again, going to the nature of writing and abetting allegations, they knew from a variety of sources, including human rights organizations like Amnesty and Human Rights Watch and publications. And it was widely known at the time that if they went in there and they actually gave up these confidential communications, they would basically be putting targets on the backs of people like Mr. Ning. And in fact, that's what happened. They knew that it would happen if they agreed to disclose. They did agree to disclose. I think that's further demonstrated, although this is evidence rather than allegations. We attached the hearings in 2007 to the complaint. And I think there they concede that they disclosed information at least about two dissidents. The congressman said that there were four that they knew about. None of it includes Mr. Ning. And they then said they couldn't tell anybody about how many had actually been essentially handed over to the police state. Counsel, in this case, your complaint was a little unclear on whether or not you think the individual defendants here turned over Mr. Ning's information. I think there was an allegation that they were aware of or directed, right? What's the actual precise allegation you're making that the individual defendants had? Well, at a minimum, what we're saying is that Mr. Yang and Mr. Simmel controlled Yahoo and its wholly owned subsidiary after they entered the Chinese market. At a minimum, they had an order from the beginning, an agreement with the Chinese government that they would disclose and request confidential information from users' emails in China. That policy was never communicated to the users. They never notified the users. But they clearly did turn over confidential information in Mr. Ning's case. So if that's the allegation, then how does that survive the Nestle extraterritoriality standard, which requires more domestic conduct than general corporate activity? Because that sounds exactly like general corporate activity. Well, I guess it's a little bit unclear, Your Honor, exactly what the court meant by general corporate activity. I mean, I think it would be fair to say that they left that somewhat open. In Nestle itself, the claims were very much different from the claims in this case. In other words, what they looked like, at least to the court, was more like mere corporate presence, which they said was not enough in Kiobel. Mere corporate citizenship, which this court said wasn't enough in Mojica, and many courts have said that. The main theory in Nestle was that they didn't use their market position to end child slavery. They also did some other things, like gave technical support and other things, which looked to the court like something that was disconnected from the actual fundamental claim of facilitating child slavery. Counsel, do you have anything to tie the Yahoo executives to this particular request from the Chinese government? We don't have specific evidence because there's no way to get within Yahoo's. And so your allegation is limited to the fact that they knew in advance that the Chinese government would require this information. They agreed to provide that. And so they are now liable for everything that occurs from any information the Chinese government asks and they cooperate with? Well, what our position is is that they made an agreement with the Chinese government that they would disclose on request users' information, and that they knew going into that that if they did that, they would actually be doing exactly what they did to Mr. Lin. I think the answer to my question is yes, they're liable for everything, but it wouldn't be limited to your client. It wouldn't be limited to Ning. Well, that's correct. It would extend to any Chinese citizen who had their information released and something bad happened to them. Well, I'm not sure it would go to something bad. What they knew was that if they turned over information that, for example, for pro-democracy activists in the aftermath of Tiananmen Square, they knew that the Chinese government was persecuting those people by arresting them, torturing them, imprisoning them, in some cases executing them. And so at least the category of people like Mr. Ning who were in that category, they would be responsible for. And we don't know. Just to be clear, what category are you referring to? Well, what our position is is that if they turned over information from political dissidents like Mr. Ning, that they knew that by doing that, they were subjecting them to these human rights violations. That everybody knew that, they knew that, and they did it anyway. And they did it in order to get into the Chinese market. And on the extraterritoriality point, I mean, the reason that this is different from Nestle is that this is a specific corporate policy that's not general corporate oversight. They had to do this to get into the market. Doesn't that happen in every country? Don't companies have to comply with the legal process of every country? Well, I think, first of all, I think that the lawful orders argument, it seems to me, is a defense to a claim. Well, I'm just saying it just sounds like general corporate activity. Well, I don't think so in the sense that, you know, when you're doing business with China, you know that you're doing business with a government that violates the rights of its citizens under international human rights law. Anti-torture, for one thing. That's different from complying with a subpoena in an antitrust case in Switzerland or England. Right. I mean, I think that you know what you're getting into there. And there are I think there are alternatives for that. I mean, they could have not turned over that kind of sense of data. They could have just suspended those accounts. They could have told people in advance, don't use our service because it's not as confidential as Mr. Ning thought it was. He put passwords on it. He encrypted it. You know, he thought that he was engaged in an activity that would not be where his information was not going to be turned over to the government. That was threatening to to imprison, torture and execute he and his colleagues in the aftermath of Tiananmen. And so I think it's, you know, I do understand that there would be issues in a in a case on the merits. Counselor, you're over your time. How about I give you two minutes on rebuttal? OK, thank you, Your Honor. Thank you, Judge Bumate, and may it please the court. Supreme Court has told us that the Alien Tort Statute must be narrowly construed and sparingly applied. And a faithful application of that standard here requires affirmance of the district court's judgment for a whole host of reasons. And the most straightforward problem with plaintiff's complaint is the one that the district court identified, the that it fails a routine application of the pleading standard. Plaintiff alleges that Yahoo and its executives conspired with the Chinese government in a joint effort to silence pro-democracy dissidents in China. But there are no plausible factual allegations in the complaint supporting that claim. There are lots of details in the complaint about plaintiff's mistreatment by the Chinese government. But when it comes to the defendants in this case, there are no factual allegations tying the defendants to that conduct. So the district court correctly dismissed the complaints and this court should affirm. They're here on an aiding and abetting theory. You want to comment on aiding and abetting as a plausible alternative to saying they weren't immediately complicit? So the Supreme Court has never authorized an aiding and abetting claim under the ailing tort statute or the TVPA. The Solicitor General has long taken the position that it's not a proper ATS claim. And there's a discussion of that on page 22 of the Solicitor General's amicus brief in the Nestle versus Doe case. Aiding and abetting is not a tort. It is a means of allocating secondary responsibility. And particularly under the TVPA, which is a statute with no codified aiding and abetting liability, under the Central Bank of Denver case, we don't infer aiding and abetting liability when it's not in the statute. So to the answer to Your Honor's question where— I thought that we had abrogated the difference between primary and secondary actors in criminal actions. Maybe as a matter of domestic law. But when the ATS is defining the scope of liability based on customary international law. And there, under the SOSA two-step framework, we look to whether there is a definite, established, universal norm. And on aiding and abetting liability, there isn't, especially in the TVPA where we have a statute. What about the TVPA? I mean, we have all kinds of written criminal statutes. And yet, we allow aiding and abetting, again, to be proven as a—you can be held liable as a principal under aiding and abetting. Yeah, again, Your Honor, I think it is different in the alien tort statute context where SOSA tells us to exercise great caution in expanding liability beyond what international law recognizes and certainly beyond what a statute recognizes. But this is not—we have several other layers of arguments on aiding and abetting liability. There is no substantial assistance alleged in this complaint. As you heard Mr. Hoffman describe plaintiff's claim, it is that Yahoo entered the Chinese market knowing that the Chinese government mistreated its citizens, and in particular, political dissidents. That is not substantial assistance in the unlawful conduct here, the torture that's alleged in the complaint. That fails all the substantial assistance standards. But that does sound like a little more than what was at stake at Nestle, right? It seems like a little more foreign activity. If they make an agreement, you know, ex ante when they answer that you're going to turn over any information requested, doesn't that make it a little more than domestic conduct or general corporate activities, I guess, the Nestle standard? I don't think so, Your Honor, because Nestle says corporate activity like decision-making. And what's alleged here is decision-making. It's not alleged that Yahoo or its executives had any actual role in the horrific treatment. It's that the executives made a decision, and that decision was to enter the Chinese market knowing that this would happen. So that is no more extraterritorial than the decision-making that was described in the Nestle v. Doe case. But again, extraterritoriality is yet one other hurdle that has to be surmounted here. The substantial assistance standard is not met, and the purpose standard is not met. So it's clear from all the circuits currently binding that purpose and not knowledge is the proper mens rea standard for an aiding and abetting claim. And there's not even an argument in the papers today or an allegation in the complaint that Yahoo or its executives had a purpose to torture Mr. Ning or an intention to do so. Again, the only claim is that Yahoo entered the Chinese market knowing that this might happen, and that is not a purpose. And you can look at so many cases from the Second Circuit and Fourth Circuit holding expressly that this sort of general commercial activity with knowledge that something might happen is not enough under that standard. Even in cases where there was falsified evidence and inducing an arrest, active conduct, even there it was said that it was held in the Balintulo case or in the Lubushan case that it was not sufficient to satisfy either the substantial assistance or the purpose mens rea standard. On the secret agreement point, too, I just want to emphasize that the allegation is not really that there was a secret agreement. There's not facts supporting the existence of an agreement. It is, as Mr. Hoffman said this morning, that Yahoo would have had to agree in order to enter the market. It's that, you know, obviously this would have happened, otherwise they couldn't have entered the market. And why is that not an agreement? That's not a plausible allegation to the factual basis for the existence of an agreement. It is sort of an allegation that, you know, we can assume there was an agreement because China was allowed to enter the market. But there's no allegation of… If China had a published policy that said anyone who wants to come in and enter our markets must agree to cooperate with the government, that wouldn't be a secret agreement, but it would be an agreement, wouldn't it? I mean, if it was an understood condition of entering Chinese markets. It would be closer, I think. I think you would still have to allege that, in fact, the defendants did enter into that agreement, and there would have to be some allegation as to the scope of the agreement. Here we don't even know… The scope of the agreement, at least as I understand the allegations, the scope of the agreement is you want to come into China, you have this database of users, then you must turn over to the Chinese government upon request any such data. That seems to be what's alleged here. Is that not enough of an agreement? It might not have happened, but… I think that is a charitable reading of the specificity of the complaint, Your Honor, but there's a difference between an agreement that, for example, Yahoo will comply with Chinese law, generally speaking, or Yahoo will comply with government requests for information. That is a very different agreement from Yahoo wants to join arms with the Chinese government to silence political dissidents. Even if the former agreement was alleged, that would be no basis for aiding and abetting liability under any standard. The latter agreement gets closer, but that's why a plaintiff has to allege some factual basis for the agreement because they don't get to unlock the doors to discovery without at least providing a basis for understanding what the nature of the agreement is, who the agreement was with. The allegation is that it was with the vague members of the Chinese government. We don't know whether this is an official agreement or something more underhanded. We don't know how the plaintiff even came to learn of this secret agreement. Well, what about the congressional testimony? I think it was Mr. Yang's testimony. They clearly met with Chinese officials to start Yahoo in China. They met with Chinese officials? I don't know that that's a proper allegation since it's just in a committee report, but meeting with the Chinese officials is not an allegation that in those meetings there was some secret agreement to participate in the silencing of political dissidents, including through torture. Well, it seems to me that you kind of want to use the congressional testimony both ways in that, well, it doesn't apply to Mr. Ning because he's not mentioned in there, and meeting with the Chinese is what every company does when they want to enter into a foreign market. But then you turn around and, as I understand it, basically saying, but it's really a Chinese subsidiary there or a Chinese wholly-owned different company, and that's not the same as your client, and therefore, bingo, no liability. So can you explain what your view is on the congressional testimony? Yes, Your Honor, thank you. We don't think that the court needs to consider the congressional testimony. It was just attached to the complaint. What governs is the allegations in the complaint, and the fact that it was a Chinese subsidiary and not the defendants in this case is alleged at paragraphs 13 through 15 of the complaint. So that's not found solely in the congressional testimony. But because plaintiff attached the House report to his complaint, I don't think that the court can construe the allegations of the complaint in a way that is inconsistent with that testimony. But I don't think the court even needs to consider it. I think the court focuses on the allegations in the complaint, and based on the allegations in the complaint, there is not a plausible ailing tort statute, TBPA, or UCL claim alleged. Can I ask one question before you go? As your colleague said, Nestle did not provide much of a standard for us to apply on what constitutes more domestic conduct than general corporate activity. Do you have a standard that we could apply or any sort of test that we should administer in determining whether or not it satisfies Nestle? On extraterritoriality, I think the Nestle court was pretty clear. When what we're talking about is corporate activity like decision-making, and it's not just general corporate activity. The court said specifically decision-making. So, for example, if there was an allegation that Mr. Yang and Simmels personally directed turning over Mr. Ning's information to China, that would be enough? If they were the ones that turned the information over rather than just directed it. Well, if they directed it, I don't think that's enough to make it a domestic application of the statute because the act of turning over the information, as I understand your Honor's hypothetical. Well, presumably there's someone here in California where they usually are, and they direct China, their Chinese affiliates, to hand over Mr. Ning's information. If the turning over the information emanated from California, the actual turning over the information, that would, I think, be closer to extraterritorial conduct. What if Yahoo China came back and said to corporate, we've got an issue here, we need your help. It's taken to the general counsel, it's taken to top decisions, you know, closed doors. Somebody says this is pretty serious. The Chinese government has requested this from Yahoo China. And the top decision-makers say, yeah, I think we better turn it over. Now, is that sufficient? No, your Honor, because that is decision-making. That's like exactly what the Nestle court said is not extraterritorial conduct because all that's being done is a decision being made. There's no actual involvement in the conduct that is the focus of the statute. Well, I mean, that seems to me to be a circular argument because decision-making leads to action, leads to what happens. So if every American company can hide behind the ATS defenses and say, all we did is make decisions, what happened in China, we didn't do that. So I guess I'm not understanding how your argument actually gets you out of Nestle or some common-sense application of Nestle. So two responses, your Honor. The first is that that is at least clear to me from the face of the Nestle opinion that corporate activity like decision-making is not extraterritorial conduct,  What if Yahoo China says, we don't intend to comply with this unless corporate headquarters tells us to do so? And now goes to the general counsel, comes up to the top decision-makers, and they said, yes, we're directing you to cooperate. Now, does that make a difference? As opposed to simply acquiescing or approving a decision or ratifying a decision that's been made in China? I think that's still decision-making, your Honor. I mean, that's still, that's still. So nothing would satisfy this short of Yahoo deciding to volunteer, to voluntarily give this information without a request from the Chinese government? Well, no. If the actual turning over the information, if that were a viable ATS claim, if the turning over of the information happened in China, or sorry, in the United States, then that would be, likely be domestic conduct. But if the decision to turn over the information is made in California, then that decision does not by itself bring all of the resulting conduct to the United States and make it actionable under the ATS. How would that work in the electronic context? You know, I assume the Yahoo servers are here, and they say turn it over, and they just zap it over to China. Is that, was that enough? It's a very good question, your Honor. I don't think that any of the cases have analyzed extraterritoriality based on where, you know, the ones and zeros are hosted. It's a very, very good question. But what we know from both Nestle and the Balintulo case in the Second Circuit where, you know, the decision to turn over the information and the decision to provide vehicles to the apartheid government, that was made domestically, and the court said it's not enough because it was Ford's South African subsidiary that actually carried out the decision, and that's extraterritorial conduct. Thank you, counsel. Thank you, your Honor. Go ahead, Mr. Hoffman. Thank you, your Honor. First of all, on this last question, Nestle doesn't say that decision-making can never be aiding and abetting from U.S. territory, and this court in Doe v. Nestle in the 200, 2018 version said aiding and abetting from the United States can avoid, is a domestic application. For example, in Nestle, had the Cargill executive said, we want you only to buy cocoa beans from slave plantations, that's a different story than general corporate oversight, right? And what we're saying is that our case is more like that, that Yang and Semmel basically said, you are to give up the confidential information of people on request from the Chinese government, that is a policy of Yahoo, it's a policy of Yahoo before there were subsidiaries, it's a policy of Yahoo now that there are subsidiaries. So that's an extraterritoriality, I would make that point. On aiding and abetting, you know, again, this court has already decided, aiding and abetting is a theory of liability under both the TVPA and the ATS. It is Doe v. Nestle in 2014 laid out the requirements for an aiding and abetting claim, and we satisfy them. And the purpose allegation fits exactly within the Doe v. Nestle decision in 2014, and that was not affected by the Supreme Court's decision in Nestle v. Doe, which was only about extraterritoriality. I understand that the Solicitor General argued against aiding and abetting liability in Nestle v. Doe for the first time. No circuit has adopted that position. Every circuit that has looked at it has either decided that there's aiding and abetting or has punted on that question with respect to the TVPA. So that is there. Substantial assistance as the international authority, so identifying victims for persecution is an actus reus that satisfies any reasonable application of aiding and abetting at the international level, and aiding and abetting is an international crime. Well, you know, the identification of individuals for persecution or torture seems a far cry from even an alleged agreement that you'll turn over documents. So it hasn't been identified by the corporation, correct? Unlike the slave example, which is we will use slaves to do our work in this country. But they do know going in that they have to agree to hand over confidential information, and they know that people who are going to use this in the Chinese society are going to include people like Mr. Ning, who believe that they are able to use Yahoo services to exchange information. And when they get that request, they have a decision to make whether they're going to hand it over or not. If they hand over, and they know if they're going to hand over information like Mr. Ning's emails, what's going to happen is what happened to Mr. Ning. And in fact, some of his colleagues were executed. He fortunately was not executed, but he spent 10 years, a very tough time, based on talking about the desire to have democracy in China. And so basically that's what Yahoo, that's the deal they made. And they knew that they were going to be complicit in the persecution of people like Mr. Ning if they had a disclosure policy, and they had it. And they hurt him and they hurt many other dissidents. And I think what we're saying is that's the agreement, that's the policy, that's the deal that they made, and that satisfies all the requirements for aiding and abetting liability under this circuit's holdings and under international law. And so I think that's very different from the kind of activity that the court was dealing with in the Nestle context for extraterritoriality. And of course for the TVPA, you don't even have to reach that because the TVPA is expressly extraterritorial and reaches defendants Yang and Semmel, who were the central actors in negotiating the entry into China and had to come up with the disclosure policy. We don't have to have all the details. We can't get into Yang's documents. You have to look at the facts and circumstances that exist and the inferences to be drawn in order to get to discovery. And then at that point, we would know. And if they have defenses based on lawful orders or other things, they can make them. But the point is our allegations are not only plausible, that's what happened. I think you can tell that from the 2007 hearing, from the prosecutor's memo in his particular case. That's what happened. And we should at least be able to get past a motion to dismiss in order to get discovery into this case. I know I've gone over my time. Thank you, counsel. Thank you both for an excellent argument. This case is submitted.
judges: McKEOWN, BYBEE, BUMATAY